IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :      CIVIL ACTION NO. 12-1721

                     :

         v.                  :

                     :

JAMES KELLY, JR.            :      CRIMINAL ACTION NO. 07-123

## MEMORANDUM

**Padova, J.**                                                **June 27, 2013**

Before the Court is James Kelly, Jr.'s Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255. We held an evidentiary hearing on the Motion on May 8, 2013. For the following reasons, the Motion is denied.

## I.     BACKGROUND

On January 17, 2008, Kelly was convicted by a jury of one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The charge arose from his February 4, 2007 arrest for DUI in Lower Southampton Township, Bucks County, Pennsylvania. The evidence admitted at trial established that around 10:00 p.m. on Sunday, February 4, 2007, Police Officer Luis W. Montalbano of the Lower Southampton Township Police Department was on patrol in a marked police car in the area of Street Road and Central Avenue when he observed a white Dodge Intrepid (the "Dodge") go through a steady red light. (1/14/08 N.T. at 122, 124-25.) He followed it and observed it traveling between 55 and 60 m.p.h. in an unsafe manner in an area with a speed limit of 45 m.p.h. (Id. at 125-26.) He pulled the Dodge over in the area of Street Road and Buck Road. (Id. at 127.)

Officer Montalbano approached the driver's side of the vehicle, which was registered to Kelly's wife. (Id. at 130; 1/15/08 N.T. at 61; Gov't Trial Ex. 27.) Kelly was the only person in

the car.  (1/14/08 N.T. at 130.)  Officer Montalbano observed that Kelly appeared glassy eyed and that there were empty and full beer bottles on the floor of the car in front of the front passenger seat.  (Id.)  Officer Montalbano asked Kelly to walk to the rear of the Dodge and detected an odor of alcohol from him.  (Id. at 133-34.)  The weather was cold, but Kelly was not wearing a jacket when he got out of the car.  (Id. at 135.)  Officer Montalbano administered field sobriety tests to Kelly, who either declined to take or failed those tests.  (Id. at 136-38.)  Officer Montalbano concluded that Kelly "was intoxicated and incapable of safe driving."  (Id. at 138.)  Officer Montalbano asked Police Officer Eric Landamia, also of the Lower Southampton Township Police Department, who had arrived at the scene, to administer a portable breath test.  (Id. at 132, 138.)  Kelly admitted to Officer Landamia that he had been drinking.  (1/15/08 N.T. at 8.)  According to the portable breath test, Kelly had a blood alcohol level of 0.09 (id. at 13), which, in Pennsylvania, "is considered legally under the influence and can produce unsafe driving."  (1/14/08 N.T. at 139.)

Officer Montalbano placed Kelly under arrest.  (Id. at 140.)  Officer Montalbano then asked Officer Landamia to call the duty tow so that the Dodge could be impounded and also directed Officer Landamia to conduct an inventory search of the car and to wait with it until it was towed.[1]  (Id. at 144-45.)  When Officer Landamia found that the Dodge was locked, Kelly claimed that he must have locked the keys in the car.  (1/15/08 N.T. at 17.)  Officer Montalbano looked into the Dodge and noticed a black jacket lying on the driver's seat where Kelly had been sitting.  (1/14/08 N.T. at 145.)  Later, after Officer Montalbano took Kelly to the police station, he searched Kelly and found the key to the Dodge in Kelly's left sock.  (Id. at 149.)

---

[1]An inventory search is a "cursory search of the interior, checking for personal property or any type of valuable belongings."  (1/15/08 N.T. at 15.)

Harkins Auto Body, the duty tow, came out to tow the Dodge and opened it for Officer Landamia. (1/15/08 N.T. at 19-20.) Officer Landamia then opened the driver's side door and noticed "a black leather jacket on the driver [sic] seat." (Id. at 21.) The jacket appeared to have been sat on. (Id. at 22-23.) Officer Landamia picked the jacket up by the collar and heard a clanking sound. (Id. at 23.) He looked down and observed a revolver between the driver's seat and the kick plate. (Id.) The revolver had not been there when Officer Landamia opened the door. (Id.) Later, after Kelly was taken to the police station, he identified the jacket as his. (Id. at 38-39.)

Kelly filed a *pro se* Motion for Judgment of Acquittal on June 25, 2008, asserting two grounds for relief: (1) there was insufficient evidence for the jury to convict him of violating 18 U.S.C. § 922(g)(1); and (2) the copy of Indictment No. 07-123 which was provided to the jury during deliberations contained a reference to 18 U.S.C. § 924(e) and thus created a serious danger that a miscarriage of justice occurred. See United States v. Kelly, Crim. A. No. 07-123, slip op. at 4-6 (E.D. Pa. July 1, 2008). We examined the evidence admitted at trial and concluded that any rational juror could have found beyond a reasonable doubt that Kelly possessed the gun found in the front seat of the Dodge, that the gun was a firearm, and that it had passed in interstate commerce. Id. at 3-6. We further concluded that Kelly had not established that the provision of Indictment No. 07-123 to the jury was plain error that affected the outcome of his trial. Id. at 7-8. We therefore denied Kelly's Motion for Judgment of Acquittal in its entirety.

We sentenced Kelly on July 1, 2008. Title 18, United States Code, Section 924(a)(2) provides that the sentence for violation of 18 U.S.C. § 922(g) is a fine, imprisonment for not more than ten years, or both. 18 U.S.C. § 924(a)(2). However, at the time of his sentencing, we

3

found that Kelly had an extensive criminal history, including three previous convictions for

violent felonies or drug offenses, making him eligible for sentencing as an armed career criminal,

which gave rise to a statutory mandatory minimum term of imprisonment of fifteen years

pursuant to the Armed Career Criminal Act ("ACCA").   See 18 U.S.C. § 924(e)(1).

Consequently, we sentenced Kelly to fifteen years of imprisonment, five years of supervised

release, a $500.00 fine, and a $100.00 special assessment.

Kelly appealed his conviction and sentence on July 14, 2008.  He argued on appeal that

the Government had not proven that he was in possession of the gun, but only that he was in

close proximity to it.  United States v. Kelly, 403 F. App'x 722, 725 (3d Cir. Dec. 7, 2010).  The

Third Circuit rejected this argument, determining that "there was substantial evidence from

which a jury could reasonably conclude that Kelly had knowledge of the gun's presence."  Id.

Kelly also argued that he wasn't subject to sentencing pursuant to the ACCA because the Court

did not require the Government to prove the applicability of the ACCA to the jury, even though §

924(e) was cited in the Indictment.  Id. at 725-26.  The Third Circuit also rejected this argument.

Id. at 726.  Kelly filed a petition for writ of certiorari to the Supreme Court on March 4, 2011.

The Supreme Court denied certiorari on April 4, 2011.  Kelly v. United States, 131 S. Ct. 1837

(2011).

Kelly filed the instant Motion on April 26, 2012.[2]  He raises five grounds for relief, all of

which are based on the alleged ineffective assistance of his trial counsel.  Kelly asserts that:  (1)

his attorneys were ineffective in failing to notify him that the Government had made a plea offer;

(2) his trial counsel was ineffective for advising him not to testify in his own defense; (3) his trial

---

[2]Kelly initially filed a § 2255 Motion on the wrong form on April 6, 2012.  That Motion
was dated April 2, 2012.  Consequently, we consider Kelly to have filed his § 2255 Motion
within the time provided by 28 U.S.C. § 2255(f).

counsel was ineffective for failing to call his brother as a defense witness; (4) his trial counsel was ineffective for allowing him to be convicted on insufficient evidence; and (5) his trial counsel was ineffective for failing to challenge a prior conviction that was used to enhance his sentence pursuant to the ACCA. We appointed counsel to represent Kelly in connection with this Motion on February 13, 2013 and held an evidentiary hearing on May 8, 2013 (the "Hearing").

## II.    LEGAL STANDARD

Kelly has moved for relief pursuant to 28 U.S.C. § 2255, which provides as follows:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). "'Section 2255 does not provide habeas petitioners with a panacea for all alleged trial or sentencing errors.'" United States v. Perkins, Crim. A. No. 03-303, Civ. A. No. 07-3371, 2008 WL 399336, at *1 (E.D. Pa. Feb. 14, 2008) (quoting United States v. Rishell, Crim. A. No. 97-294-1, Civ. A. No. 01-486, 2002 WL 4638, at *1 (E.D. Pa. Dec. 21, 2001)). In order to prevail on a Section 2255 motion, the movant's claimed errors of law must be constitutional, jurisdictional, "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary demands of fair procedure." Hill v. United States, 368 U.S. 424, 428 (1962).

Kelly's claims are all based on the alleged ineffective assistance of his attorneys. In order to prevail on a claim for ineffective assistance of counsel, a criminal defendant must demonstrate both that (1) his attorney's performance was deficient, *i.e.*, that the performance was unreasonable under prevailing professional standards, and (2) that he was prejudiced by his

attorney's performance. <u>Strickland v. Washington</u>, 466 U.S. 668, 687–88, 690-92 (1984). Prejudice is proven if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> Consequently, counsel cannot be found to be ineffective for failing to pursue a meritless claim. <u>See</u> <u>United States v. Sanders</u>, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument." (citations omitted)); <u>see also</u> <u>Parrish v. Fulcomer</u>, 150 F.3d 326, 328 (3d Cir. 1998)).

## III. DISCUSSION

### A. <u>The Plea Offer</u>

Kelly asserts in his Motion that the Government communicated a plea offer to his then attorney, Dina Chavar, between March and June 2007. (Kelly Mem. at 1.) He further asserts that he did not learn about the plea offer until months later, when his trial attorney, Ellen Brotman, found a note about the plea offer that had been written by Chavar in her case file. (<u>Id.</u>) According to Kelly, the note did not mention the terms of the offer, and he never learned the terms of the Government's plea offer. (<u>Id.</u>) Kelly contends that Chavar was ineffective for failing to notify him of the plea offer and that Brotman was ineffective for failing to attempt to re-open plea negotiations with the Government after she learned of the earlier plea offer.

In <u>Missouri v. Frye</u>, 132 S. Ct. 1399 (2012), the Supreme Court held that:

> as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. . . . When defense counsel allowed the offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires.

Id. at 1408. The Supreme Court explained that, in order to show prejudice "where a plea offer has lapsed or been rejected because of counsel's deficient performance," the defendant must demonstrate a reasonable probability that he would have accepted the plea offer, that "the plea would have been entered without the prosecution cancelling it[,]" and that it would have resulted in "a plea to a lesser charge or a sentence of less prison time." Id. at 1409 (citation omitted).

The record shows that Kelly had several attorneys before Brotman was appointed to represent him. The Defender Association of Philadelphia, Federal Court Division was appointed to represent Kelly during Kelly's initial appearance in this case on February 14, 2007, and Kelly was first represented by Luis Ortiz. (Docket Nos. 5-6.) David Kozlow entered his appearance for Kelly on February 21, 2007. (Docket No. 10.) Kelly's third attorney, Dina Chavar, entered her appearance for Kelly on March 29, 2007. (Docket Nos. 10, 15.) Kelly had a conflict with Chavar regarding the manner in which she was handling his defense and he requested the appointment of new counsel. (5/8/13 Hr'g Tr. at 17-18, 20-21.) We appointed Stephen J. Britt, Esquire to represent Kelly on June 29, 2007, and vacated the appointment of the Defender Association. (6/29/09 Order.) Kelly was never comfortable with Britt's representation. (5/8/13 Hr'g Tr. at 21.) On September 25, 2007, at Kelly's request, we vacated Britt's appointment as Kelly's attorney and appointed Brotman to represent Kelly. (9/25/07 Order.)

During the May 8, 2013 Hearing, Kelly and Brotman both testified regarding whether Kelly was interested in entering into a guilty plea agreement prior to his trial and whether the Government had made a plea offer in this case. Kelly testified that he has maintained his innocence since the inception of this case, that he still maintains his innocence, and that it was his intention to go to trial. (5/8/13 Hr'g Tr. at 15-16, 70.) Kelly explained that he would only have been interested in pleading guilty if it would have enabled him to avoid the mandatory

minimum 15-year sentence required by the ACCA. (Id. at 63, 70.) Kelly never discussed a plea offer or cooperation with any of his attorneys before he discussed the note with Brotman. (Id. at 15, 16, 22.) After Brotman had been Kelly's attorney for a few months, and while they were getting ready for trial, she told him that Chavar had left a note in his file stating that there was a plea offer "and that if [he] wanted to help [the Government] resolve previous issues, that they wanted to talk to [him]." (Id. at 23-24.) Kelly did not ask Brotman to contact the Government to respond to that note. (Id. at 26-27.)

Brotman testified that she met with Kelly after she first agreed to represent him, and that he wished to go to trial. (Id. at 89-90. 135.) She nonetheless thought that he would be open to discussing a plea if the Government agreed to forego the ACCA enhancement. (Id. at 135.) However, Richard Zack, the Assistant United States Attorney prosecuting Kelly, would not agree to eliminate the ACCA enhancement. (Id.) Zack also refused a request from Brotman that he agree to allow Kelly to be prosecuted for being a felon in possession of a firearm in state court, where he would face a lesser sentence. (Id. at 131.) Brotman saw no point in further pursuing a plea agreement with the Government. (Id. at 135.)

Brotman brought to the Hearing a letter that Zack sent to Chavar on April 10, 2007, which Brotman located in her case file. (5/8/13 Hr'g Tr. at 129; Hr'g Ex. Court-1.) The letter, which largely concerned discovery and trial matters, also mentioned the possibility of a guilty plea. (Hr'g Ex. Court-1.) Specifically, the letter states the following: "If your client is interested in resolving the instant charges and to discuss [sic] resolving other matters that are currently under investigation by way of a guilty plea please call me." (Id. at 2.) Brotman did not find anything in her file that indicated that the Government had made a specific plea offer. (5/8/13 Hr'g Tr. at 131.)

Based on the evidence presented during the Hearing, we find that the Government did not make a plea offer to Kelly. Although Zack's letter to Chavar indicated that he would be willing to discuss a possible plea if Kelly was interested in pleading guilty and "resolving other matters" (Hr'g Ex. Court-1), there is no indication in the record before us that Kelly was interested in pleading guilty and resolving other matters[3] and, more importantly, there is no evidence that any plea offer was ever made. Since Chavar could not be ineffective for failing to tell Kelly about a plea offer that did not exist, we find this aspect of Kelly's ineffectiveness claim to be meritless. The record shows that Brotman spoke to Zack about alternatives that would have allowed Kelly to plead guilty to charges that did not include the ACCA enhancement, but Zack was not willing to agree to those alternatives. (Id. at 131, 135.) We thus conclude that Brotman was not ineffective for failing to pursue a plea agreement with the Government.

Moreover, we further find that this ineffectiveness claim is meritless because Kelly has failed to establish that he was prejudiced by his counsels' alleged failure to pursue a plea agreement on his behalf. The record shows that Zack was not willing to explore an alternative that would not include the ACCA enhancement. (Id.) Consequently, Kelly would have obtained no benefit from pleading guilty to the charge of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), because he still would have faced the fifteen year statutory mandatory minimum term of imprisonment for that offense pursuant to the ACCA. See 18 U.S.C. § 924(e)(1). In the absence of evidence that the Government would have offered a plea that allowed Kelly to receive less prison time, Kelly cannot show that he was prejudiced by either Chavar's failure to tell him about Zack's April 10, 2007 letter or Brotman's failure to further

---

[3]Kelly maintained his innocence throughout the proceedings in this case and wanted to go to trial. (5/8/13 Hr'g Tr. at 15-16.)

pursue a plea agreement with the Government. In sum, Kelly has not established that either Chavar or Brotman was ineffective in connection with Zack's April 10, 2007 letter, or that he was prejudiced by counsel's conduct in connection with plea negotiations. We therefore conclude that Kelly is not entitled to relief as a result of his attorneys' allegedly ineffective assistance of counsel in connection with Zack's April 10, 2007 letter and we deny his first claim for relief. See Frye, 132 S. Ct. at 1408-09.

B.    Counsel's Advice that Kelly Not Testify

Kelly argues that Brotman was ineffective in advising him against testifying in his own defense. Kelly bases this argument on his mistaken understanding, prior to and during the trial in this action, that the jury would decide whether he would be sentenced in accordance with the ACCA.[4] Specifically, Kelly maintains that his attorneys misled him regarding the ACCA charge and, as a result, he believed that since his Indictment mentioned § 924(e),[5] the jury would decide

---

[4]The question of whether a defendant should be sentenced pursuant to the ACCA is decided by the trial judge at sentencing using the preponderance of the evidence standard. See Kelly, 403 F. App'x at 726. "[P]rior convictions that increase the statutory maximum for an offense are not elements of the offense and thus may be determined by the District Court by a preponderance of the evidence." United States v. Coleman, 451 F.3d 154, 159 (3d Cir. 2006) (citing Almendarez-Torres v. United States, 523 U.S. 224, 243 (1998)). The Third Circuit explained in Kelly, that "[s]imply put, 'recidivism . . . is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence.'" Id. (quoting Almendarez-Torres, 523 U.S. at 243). While the holding of Almendarez-Torres has been called into question, see Alleyne v. United States, -- U.S. --, 2013 WL 2922116, at *4 (2013) (overruling United States v. Harris, 536 U.S. 545 (2002) and holding that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury"), it was the law at the time of Kelly's sentencing and remains so today. See Alleyne, 2013 WL 2922116, at *9 n.1 ("Because the parties do not contest [Almendarez's] vitality, we do not revisit it for purposes of our decision today.").

[5]Count One of Indictment No. 07-123 states, in its entirety, as follows:

On or about February 4, 2007, in the Eastern District of Pennsylvania, defendant

10

whether his prior convictions satisfied the criteria for application of the ACCA enhancement. (Kelly Mem. at 3.)

Kelly testified during the Hearing that he understood at the time of his trial that it was ultimately his decision whether to testify at trial. (5/8/13 Hr'g Tr. at 43.) Prior to the trial, he discussed trial strategy with Brotman, including the advantages and disadvantages of testifying, and Brotman recommended that he not testify. (Id. at 83.) Brotman told him that, if he took the stand, Zack would be able to impeach him by cross-examining him regarding his criminal history. (Kelly Mem. at 3; 5/8/13 Hr'g Tr. at 44, 77.) Brotman also advised Kelly that, if he testified at trial, Zack would cross-examine him regarding his testimony in his Bucks County Court of Common Pleas trial on the DUI charge that arose from his February 4, 2007 arrest. (5/8/13 Hr'g Tr. at 81-82.) Specifically, she expected that Zack would cross-examine Kelly about his admission, during his Bucks County trial, that he lied to the police officers who arrested him regarding whether he had the key to the Dodge Intrepid at the time of his arrest. (Id. at 82-83.)

Kelly claims that his decision not to testify at trial was based solely on his mistaken belief that the jury would decide whether he would be sentenced in accordance with the ACCA. (Kelly Mem. at 3.) According to Kelly, he decided not to testify at trial because he thought that, if he were cross-examined about his previous convictions, he would be required to admit that he had

---

JAMES KELLY, JR., having been convicted in a court of the Commonwealth of Pennsylvania of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed in and affecting interstate and foreign commerce, a firearm, that is, a loaded Smith and Wesson model 19-5, Serial Number ACC0157. In violation of Title 18, United States Code, Sections 922(g)(1) and 924(e).

Kelly, Crim. No. 07-123, indictment (E.D. Pa. Mar. 8 , 2007).

been convicted of crimes of violence that would subject him to the ACCA enhancement. (5/8/13 Hr'g Tr. at 52.) Kelly claims that, if he had known that the jury would not decide the applicability of the ACCA, he would have chosen to testify. (Kelly Mem. at 3; 5/8/13 Hr'g Tr. at 49-51.) He also maintains that, if he had testified, he would have been able to refute evidence regarding certain items found in the Dodge Intrepid that linked him to the gun, by testifying that those items did not belong to him. (5/8/13 Hr'g Tr. at 51.)

While Kelly maintains that his attorneys misled him regarding whether the jury would decide the applicability of the ACCA, he admitted, during the Hearing, that none of his attorneys told him that the jury would decide whether he would be subject to the ACCA. (Id. at 44, 78.) Kelly also testified that he never told Brotman that he believed that the jury would decide whether he was subject to the ACCA and that his belief that the jury would decide the applicability of the ACCA was not based on anything that Brotman told him. (Id. at 53, 79, 84.)

Brotman testified during the Hearing that she had discussions with Kelly regarding whether he should testify at trial throughout her representation of him. (5/8/13 Hr'g Tr. at 101.) She told Kelly that he might need to testify at trial if she couldn't otherwise get pieces of his story into evidence, but that there were risks associated with testifying because of the possibility that he would be cross-examined regarding both his prior convictions and his testimony in the Bucks County Court of Common Pleas concerning the key to the Dodge. (Id. at 101-02.) On the day that the defense rested in this case, Brotman told Kelly that she was concerned about his testifying and that she did not think that he needed to testify:

> I said to Mr. Kelly, . . . I really felt like the case couldn't have gone in any better.
> That, you know, we had a shot. And, you know, I was very concerned about -- I
> was concerned about him testifying. That . . . it would create issues for him and I
> said, you know, it's up to you, but I don't think the case could have gone in any
> better and . . . I think we can go without your testimony.

(5/8/13 Hr'g Tr. at 102.)  Brotman was particularly concerned that Kelly's Bucks County Court of Common Pleas testimony would be used against him if he testified in the instant case, but she made it clear to Kelly that it was his decision whether he should testify.  (Id. at 104.)

> When we assess an attorney's performance under Strickland, we must be
>
> "highly deferential," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." [Strickland, 466 U.S. at 689] (citation and internal quotation omitted).  It is "only the rare claim of ineffectiveness of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989).

United States v. Hankerson, 496 F.3d 303, 310 (3d Cir. 2007).  Based on the evidence presented during the May 8, 2013 Hearing, we find that Kelly has not overcome the presumption that, under the circumstances, Brotman's advice that he not testify during his trial was sound trial strategy.  Brotman informed Kelly that he was the one who would make the decision regarding whether he would testify at trial.  She discussed with Kelly the pros and cons of testifying at trial. She told Kelly that she was concerned that, if he testified, he would be subject to cross-examination regarding his prior convictions and his admission, during his Bucks County trial, that he lied to the Lower Southampton Township Police Officers who arrested him in this case. Kelly has admitted that Brotman did not say anything to him that caused him to misunderstand the role of the jury vis-a-vis the application of the ACCA and that he did not say anything to Brotman that would make her aware that he mistakenly believed that the jury would decide whether he should be sentenced in accordance with the ACCA.  We conclude that Kelly has not established that Brotman's advice that he not testify at trial was unreasonable under prevailing

13

professional standards and, therefore, that he has not established that Brotman was ineffective.

See Strickland, 466 U.S. at 687-88. Accordingly, we deny Kelly's second claim for relief.

      C.      Failure to Call Danny Kelly as a Trial Witness

Kelly argues that Brotman was ineffective in that she failed to call his brother, Danny Kelly, as a defense witness. Kelly and Brotman maintained the following theory of the defense at trial:

> the defense asserts that the defendant's brother, Daniel Kelly, placed the black leather jacket and the gun in the white Dodge Intrepid in the early morning hours of February 4, 2007, Super Bowl Sunday, and that the defendant, James Kelly, Jr., was unaware that this had occurred and drove the car without knowing that a gun was within it.

(1/16/08 N.T. at 103-04.)[6] James Kelly maintains that his brother's testimony was crucial to his theory of the defense and would have convinced the jury that he was not guilty of the crime charged:

> Had Danny Kelly been called, his testimony would have provided crucial evidence needed to support Kelly's defense, that Kelly had no knowledge that a gun was in the car he was driving. Danny Kelly had placed the gun in the car, and he had not told Kelly it was there. Danny Kelly was the only person who could have affirmatively corroborated Kelly's defense, which focused on the circumstances of Danny Kelly placing the gun in the car. The jury should have been allowed to hear and evaluate Danny Kelly's testimony.

(Kelly Mem. at 5 (citation omitted).) During the Hearing, Kelly explained how he ended up driving the Dodge the night of February 4, 2007 as follows. Around 8:45 p.m., he received a call from his brother Danny who said that he (Danny) had been arrested and was being held on $25,000 bail at the 15th District in Philadelphia. (5/8/13 Hr'g Tr. at 28-29.) Danny was living with Kelly at that time. (Id. at 29.) Kelly and his sister, Kathleen Redding, drove to District 15

---

[6]This quote is an excerpt from Kelly's theory of the defense jury instruction which we read to the jury on January 16, 2008 at Kelly's request.

and picked up a key ring, Danny's wallet and a cell phone.  (Id. at 29-30.)  A police officer at the District told Kelly that Danny had been arrested at the Roosevelt Motor Lodge and that the car Danny had been driving was still there.  (Id. at 30.)  Kathleen drove Kelly to the Roosevelt Motor Lodge to pick up the car.  (Id. at 30-31.)  Kelly then drove away from the Roosevelt Motor Lodge and, after he returned to Bucks County, he was stopped by the police.  (Id.)  The robbery charges against Danny were later dropped without prejudice.  (Id. at 36-37.)

Kelly believes that, if Danny had testified, Danny would have told the jury that he was involved in an armed robbery, that he was using a car belonging to Kelly's wife, that the gun in the car was his (Danny's), and that he never told Kelly that there was a gun in the car.  (Id. at 37.)  Kelly relies on two May 2008 notes signed by Danny.  The first note, dated May 5, 2008 and notarized on June 5, 2008, states that:  "I Danny Kelly was willing to testify on Jan. 15 2008 at my brother James Kelly[']s trial that he was unaware and had no knowledge that there was a firearm in his wife's car (Tracy Kelly) when he picked it up on Feb 4 2007."  (Hr'g Ex. P-5.)  Danny's other note, dated May 19, 2008 and notarized on May 19, 2008, states as follows:

> I Danny Kelly recieved [sic] a subpoena to appear in court on Jan 15, 2008 for my brother James Kelly and was willing and able to attend but was never called in to testify and also on the date of Feb 4, 2007 I was arrested and held at the 15th district and called my brother James Kelly to come up and pick up my belongings (car keys cell phone and cash money).

(Hr'g Ex. P-4.)

Brotman testified during the Hearing about her decision not to call Danny as a trial witness.  She testified that she initially wanted to call Danny to testify that the gun in the Dodge Intrepid was his gun.  (5/8/13 Hr'g. Tr. at 97.)  She met with Danny a couple of times but "he was reluctant to testify that it was his gun."  (Id.)  The armed robbery charges against Danny had been dismissed because the victim didn't want to press charges, but Brotman theorized that

Danny's reluctance to testify was connected to his concerns about the possible effect his testimony might have on his Fifth Amendment right against self-incrimination. (<u>Id.</u> at 95-98.) Brotman also doubted that Danny would be a good witness, because he had a history of drug abuse, and she thought that an association with him would be negative for her client. (<u>Id.</u> at 96.) In addition, Brotman was also concerned that Danny "might be a difficult witness to control on the stand in terms of what he might say and [she] felt like it would be easier if [she] could get the story in otherwise." (<u>Id.</u> at 100.) Brotman believed, during the trial, that she had gotten all of the facts supporting the theory of the defense into evidence through witnesses other than Danny. (<u>Id.</u> at 98-99, 100-101.)

The following evidence related to the theory of the defense was admitted at trial. Ernest Reid testified that on February 4, 2007, he drove to the Roosevelt Inn, where Danny robbed him at gunpoint. (1/15/08 N.T. at 152-55.) Reid stated that Danny was wearing a black leather jacket during the robbery. (<u>Id.</u> at 155.) Reid identified Government Trial Exhibit 24 as a photograph of the black leather jacket. (<u>Id.</u>) Philadelphia Police Officer Kenneth Smith testified that he investigated that armed robbery. (<u>Id.</u> at 173.) According to Officer Smith, the victim described the robber as "a white male wearing a black leather jacket, a black Philadelphia Eagles jersey with the number 5 on it, and blue jeans." (<u>Id.</u> at 174.) Officer Smith and several other police officers found Danny in a room at the Roosevelt Inn. (<u>Id.</u> at 174-75.) When the police officers found him, Danny was dressed as the victim described, except that he was wearing a dark brown leather bomber jacket. (<u>Id.</u> at 176.) Officer Smith testified that the black leather jacket pictured in Government Trial Exhibit 24 was not the leather jacket that Danny was wearing when the police officers found him. (<u>Id.</u>) The police officers searched the hotel room where Danny was found, but did not find a gun on the premises. (<u>Id.</u> at 177.) Officer Smith

16

believed that about 40 minutes elapsed between the time of the robbery and the time that the police officers found Danny. (Id. at 180.)

Several witnesses testified that Danny was staying with James and Tracy Kelly around February 4, 2007, that Danny had been known to drive Tracy's car, and that Danny wore Kelly's black leather jacket. Jacqueline McGuire, a neighbor of the Kellys, testified that Danny and his wife began staying with the Kellys sometime around Thanksgiving of 2006. (Id. at 182-83.) While Danny was staying with the Kellys, McGuire often saw Danny driving Tracey's car and also saw Danny wearing the black leather jacket pictured in Government Trial Exhibit 24. (Id. at 183-84.) Jason Desautel, Kelly's stepson, testified that Danny and his wife Janet were staying with him, his mother, his stepfather, and his brother the weekend of the 2007 Super Bowl. (Id. at 186-87.) Jason had to lend his car to his mother and stepfather on Super Bowl Sunday because Danny had taken their car. (Id. at 187.) Jason also testified that he had seen Danny wear his stepfather's black leather jacket and he identified Government Trial Exhibit 24 as being a picture of that black leather jacket. (Id. at 189.) Kelly's son, James Kelly, III, testified at trial that he visited his parents from mid-December, 2006 until January 1, 2007. (Id. at 194-96.) While he was there, Danny and Danny's girlfriend Janet were staying at his parent's house. (Id. at 196.) James Kelly, III further testified that Danny borrowed his mother's car every now and then and also borrowed his father's clothes, including his black leather jacket. (Id. at 198-99.) James Kelly, III identified Government Trial Exhibit 24 as a picture of the black leather jacket that Danny borrowed from his father. (Id. at 199.)

Three witnesses testified that Kelly attended a Super Bowl party on February 4, 2007. Jason Desautel testified that, around 6:45 p.m. on February 4, 2007, he drove his mother and stepfather to the home of Kathleen Redding for a Super Bowl party because Danny had his

parents' car.  (Id. at 187-88, 190.)  Kevin Redding, Kathleen's husband, testified that he had a Super Bowl Party on Super Bowl Sunday 2007 and that the Kellys attended the party.  (Id. at 201-02.)  Kathleen Redding also testified that the Kellys attended the Super Bowl party at her house on February 4, 2007.  (1/16/08 N.T. at 15.)  Kelly was not wearing his black leather jacket at the party.  (Id. at 16.)

Kathleen Redding testified that Kelly got a phone call from Danny during the party.  (Id.)  As a result of that phone call, Kelly asked Kathleen to take him to his car, and, around 8:45 p.m., she and the Kellys left the party.  (Id. at 16-17.)  Kathleen first drove Tracy home and then drove to the police station where Danny was being held, to pick up Danny's keys and wallet.  (Id. at 17.)  Kelly went into the police station and returned about ten minutes later.  (Id. at 18.)  Kathleen then drove Kelly to the Roosevelt Motor Lodge.  (Id.)  The Kellys' Dodge was at the Roosevelt Motor Lodge.  (Id. at 18-20.)  Kathleen left at the Roosevelt Motor Lodge and saw him get in the Dodge.  (Id. at 20.)  She then followed him as he drove back towards Warminster, Pennsylvania, and watched as he was pulled over by the police.  (Id. at 20.)  She watched Kelly interact with the police officers for a few minutes and then left and drove home.  (Id. at 22.)

Police Officer Montalbano, who arrested Kelly for DUI the night of February 4, 2007, testified that he saw a black leather jacket lying flat on the seat of the Dodge Intrepid where Kelly had been sitting.  (1/14/2008 N.T. at 148.)  Officer Landamia, who conducted the inventory search of the Dodge following Kelly's arrest, identified Government Trial Exhibit 24 as being a picture of the black leather jacket that he recovered from the driver's seat of the Dodge.  (1/15/08 N.T. at 22.)  Officer Landamia removed the jacket from the car to return to Kelly because it was very cold out and Kelly was not wearing a coat.  (Id.)  Officer Landamia also found a brown wallet on the front passenger seat.  (Id. at 32.)  Danny's I.D was in the wallet.

(Id.)  Officer Landamia put the wallet with the rest of the belongings that he took out of the car and gave them to Corporal Montalbano at the police station.  (Id. at 32, 37.)  Both Officer Landamia and Officer Montalbano testified that Kelly asked for the black leather jacket pictured in Government Trial Exhibit 24 when he saw it at the police station.  (Id. at 38-39; 1/14/08 N.T. at 148.)

The above-referenced trial testimony thereby provides support for the following facts pertaining to theory of the defense:  (1) Danny wore Kelly's black leather jacket and drove Tracy's car; (2) Danny had Tracy's car on February 4, 2007; (3) Danny robbed Reid at gunpoint at the Roosevelt Motor Lodge on February 4, 2007; (4) Danny was wearing Kelly's black leather jacket when he robbed Reid; (5) the police did not recover the gun Danny used to rob Reid when they arrested Danny; (6) Kelly did not wear his black leather jacket at the Reddings' Super Bowl party on February 4, 2007; (7) Kathleen Redding left her Super Bowl party on February 4, 2007 to drive Kelly to the police station to pick up Danny's wallet and car keys; (8) Kathleen Redding then drove Kelly to the Roosevelt Motor Lodge, where she saw him get into Tracy's Dodge; (9) Kathleen Redding followed Kelly back to Warminster, where she saw him being pulled over by the police.

Based on the evidence presented during the Hearing and the evidence presented during Kelly's trial, we find that Kelly has not overcome the presumption that, under the circumstances, Brotman's decision not to call Danny as a trial witness was sound trial strategy.  As we noted above, Brotman considered calling Danny as a witness, but chose not to do so because she believed that he was reluctant to testify, that he would be difficult to control on the witness stand, and that his history of drug abuse might reflect badly on him and on Kelly.  (5/8/13 Hr'g Tr. at 95-98.)  At the time that she decided not to call Danny as a witness, Brotman also believed that

19

she had presented the facts she needed to establish the theory of the defense into evidence through other witnesses. (Id. at 100.) Brotman also thought that "it was better to blame somebody that wasn't on the stand . . . th[a]n have that person come to the stand and maybe mess it up somehow." (Id. at 101.) We conclude that Kelly has not established that Brotman's decision not to call Danny as a trial witness was unreasonable under prevailing professional standards and, therefore, that he has not established that she was ineffective on that basis. See Strickland, 466 U.S. at 687–88. We consequently deny Kelly's third claim for relief.

D.    Insufficient Evidence

Kelly argues that Brotman was ineffective in that she allowed him to be convicted based on evidence that was legally insufficient to sustain a guilty verdict. Kelly specifically argues that Brotman did not do enough to challenge what he contends are three inferences that the Government urged the jury to draw in order to find that Kelly knew that the gun was in the car: (1) that Kelly hid the key to the Dodge Intrepid in his sock; (2) that Kelly used his jacket to conceal the gun; and (3) that a gun lock found in the trunk of the car showed that Kelly owned the gun. (Kelly Mem. at 6.) Kelly previously argued on direct appeal that the Government did not prove at trial that he knew that the gun was in the car. Kelly, 403 F. App'x at 725. The Third Circuit rejected Kelly's sufficiency of the evidence argument, concluding that the jury had "substantial evidence from which [it] could reasonably conclude that Kelly had knowledge of the gun's presence." Id. Absent an intervening change in the governing substantive law or other exceptional circumstances, § 2255 generally "may not be employed to relitigate questions which were raised and considered on direct appeal." United States v. DeRewal, 10 F.3d 100, 105 n.4 (3d Cir. 1993) (citations omitted); see also Davis v. United States, 417 U.S. 333, 342 (1974) (stating that an intervening change in governing substantive law that makes petitioner's

conviction and punishment unlawful constitutes exceptional circumstances that justify collateral relief under § 2255 after unsuccessful litigation of the issue on direct appeal). During the Hearing, Kelly, through his attorney, conceded that the issue of whether there was sufficient evidence to support his conviction has already been decided. (5/8/13 Hr'g Tr. at 14.) Kelly has not argued that an intervening change in the law, or some other exceptional circumstance has occurred since he litigated these issues on direct appeal. We conclude, therefore, that Kelly cannot reassert his insufficiency of the evidence claim through a § 2255 claim of ineffective assistance of counsel. We therefore deny Kelly's fourth claim for relief.

     E.     <u>Kelly's Prior Conviction</u>

Kelly contends that Brotman was ineffective in that she failed to challenge one of the three previous convictions that led to his being sentenced as a career offender pursuant to the ACCA. The ACCA, 18 U.S.C. § 924(e), provides as follows:

> In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title imprisoned not less than fifteen years . . . .

18 U.S.C. § 924(e). At sentencing, we found that Kelly had three prior convictions in the Court of Common Pleas of Philadelphia County that mandated the application of the ACCA: (1) a March 18, 1991 conviction for manufacture/delivery/possession with intent to manufacture or deliver a controlled substance (Docket No. CP-51-CR-0421931-1989), (2) a September 30, 1982 conviction for robbery and criminal conspiracy (Docket No. CP-51-0309591-1982); and (3) an April 22, 1982 conviction for robbery (Docket No. CP-51-0428331-1980). (PSI ¶¶ 23, 34, 41, 46; 6/26/08 Tr. at 40.) Kelly does not contest his convictions for the two robberies, but he denies that he has ever been convicted for a drug offense. (Kelly Mem. at 11.) Kelly contends that

there are two different state prisoner identification numbers connected with the March 18, 1991 drug conviction and he believes that his prisoner identification number was placed on the record of this conviction in error and that he has been a victim of mistaken identity. (Id. at 12.)

Kelly called Sharon Forte, a fingerprint specialist for the Philadelphia Police Department, as a Hearing witness regarding whether the fingerprints taken in connection with the arrest that led to the 1991 drug conviction are Kelly's fingerprints. (5/8/13 Hr'g Tr. at 5-6.) We accepted her as a fingerprint expert. (Id. at 7.) Forte tested fingerprints taken from an individual identified as James Kelly, Jr. on October 27, 1980, December 24, 1981, and December 22, 1987.[7] (Id. at 8, Hr'g Exs. P-1-P-3.) The Philadelphia Municipal Court docket shows that someone identified as James Kelly, who was also known as James Kelly, Jr., was arrested on December 22, 1987 for knowing/intentional possession of a controlled substance and manufacture, delivery or possession with intent to deliver a controlled substance. See Commonwealth v. Kelly, No. MC-51-CR-1219171-1987, docket (Phila. Municipal Court). This arrest resulted in the March 18, 1991 conviction for manufacture/delivery/possession with intent to manufacture or deliver a controlled substance that was attributed to Kelly in connection with his sentencing in this case. See Commonwealth v. Kelly, No. CP-51-CR-0421931-1989, docket (Phila. Cnty. Court of Common Pleas).

Forte testified that all three of the fingerprint cards she examined matched the fingerprints, Philadelphia Police identification number, and birth date of the James Kelly, Jr. who is the Defendant in the instant case. (5/8/13 Hr'g Tr. at 8.) Forte made that determination by

---

[7]Kelly does not deny that the fingerprints taken on October 27, 1980 and December 24, 1981 are his.

checking the print for each and every finger.  (Id.)  She checked the pattern, the ridge count, and classification of each finger and "determined that each one was identical to the prints [she] received from the FBI."  (Id.)  In addition, each of the fingerprint cards she examined contains the signature of the person whose fingerprints were taken.  (Id.)  The fingerprint cards were given to Kelly during the Hearing and he confirmed that the signatures on all three fingerprint cards are his.  (Id. at 10.)

We find, accordingly, that the Defendant in this action, James Kelly, Jr., is the individual who was convicted of knowing/intentional possession of a controlled substance and manufacture, delivery or possession with intent to manufacture or deliver a controlled substance on March 18, 1991.  We conclude, therefore, that it would have been futile for Brotman to have argued at sentencing that we could not consider Kelly's March 18, 1991 conviction for knowing/intentional possession of a controlled substance and manufacture, delivery or possession with intent to manufacture or deliver a controlled substance in connection with his sentencing as a career offender pursuant to the ACCA.  "There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."  Sanders, 165 F.3d at 253.  We thus deny Kelly's fifth claim for relief.

IV.    CONCLUSION

For the foregoing reasons, we deny Kelly's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 in its entirety.  An appropriate order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.